## In re SIDER VENTURES & SERVICES CORP., Debtor.

Dorothy EISENBERG, Trustee, Estate of Sider Ventures & Services Corp., Debtor, Plaintiff,

v.

## J L INTERNATIONAL, LTD., Defendant.

Bankruptcy No. 82 B 10478 (PBA).

Adv. No. 83–5212–A.

United States Bankruptcy Court, S.D. New York.

Oct. 12, 1983.

Shaw, Goldman, Licitra, Levine & Weinberg, P.C., Garden City, N.Y., for plaintiff; Karen Carter Caso, Garden City, N.Y., of counsel.

Willkie Farr & Gallagher, New York City, for defendant; Robert J. Kheel, Thomas Moers Mayer, New York City, of counsel.

## DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PRUDENCE B. ABRAM, Bankruptcy Judge.

This is the latest in a series of litigations involving the relationships among Toronto Dominion Bank (the "Bank"), J L International, Ltd. ("J L") and the debtor, Sider Ventures & Services Corp. ("Sider"). The original litigations involved the Trustee, Dorothy Eisenberg, in a dispute with the Bank over the Bank's attempt to foreclose its valid and perfected security interest in an inventory of steel belonging to the debtor. The Trustee's position in the summer of 1982 was that the steel had a value greater than the indebtedness due to the Bank. After several appraisals showing values below the outstanding debt,, the bankruptcy court authorized the Bank, as secured creditor, to sell the steel to J L and Joe Lewo ("Lewo") for the sum of $4,059,960.40. The purchase of the steel by J L and Lewo effectively discharged their own obligations to the Bank under their guarantees. Subsequently the Trustee commenced an action against the Bank to recover for the benefit of the estate the difference between the $2,000,000 appraised value of the steel and the amount paid for it by J L on the grounds that the Bank had been unjustly enriched to that extent. In granting summary judgment for the Bank, this court held that the Bank had not been unjustly enriched as it received no more than it was entitled to from the property of the estate in which it had a security interest and that any payment the Bank received from J L above the actual value of the steel represented J L's satisfaction of its obligation under the guaranty. See *In re Sider Ventures & Services Corp. (Eisenberg v. Toronto Dominion Bank),* 31 B.R. 522 (Bkrtcy.S.D.N.Y.1983), *appeal pending* —— B.R. —— (S.D.N.Y.1983).

The present litigation again requires examination of the Sider, Bank, Lewo and J L connection. This time the Trustee asserts that J L received a $100,000 voidable preference and J L has asserted that the $100,000 allegedly preferential payment was made outside the 90-day preference period and in any event J L gave new value after the receipt of the payment in the form of guaranteeing loans made to Sider by the Bank. The Trustee and J L have filed cross motions for summary judgment.

Before reviewing the legal principles which lead this court to conclude that the Trustee's complaint in this action must be dismissed, the necessary facts peculiar to this action, which have been agreed on by stipulation, must be reviewed. J L and its principal, Lewo, introduced Sider to the Bank. As a result of that introduction and induced at least in part by guarantees of payment given by Lewo and J L, the Bank in the summer of 1981 entered into an agreement in which the Bank agreed to advance up to $5 million to Sider. The Bank also obtained a security interest in all of Sider's inventory. Lewo received a $345,000 commission for his services.

The J L guarantee provides that it is to be governed by the laws of the State of New York. It is unlimited in amount and provides for a continuing guarantee of present and future advances by the Bank to Sider. The guarantee contains the following language:

> "Provided however, that no person executing this guarantee shall be liable to you hereunder for any moneys advanced to the Customer [Sider] or to others on the faith of the paper of the Customer (except for liabilities of the Customer to you arising out of requirement of the Customer based on agreements express or implied made prior to the receipt by you of the notice in writing hereinafter mentioned) after he or his executors or administrators shall have given to you notice in writing of his or their unwillingness to be liable for moneys thereafter advanced."

In September 1981 in a separate transaction, J L loaned $100,000 to Sider. On December 14, 1981, Sider drew a check in this amount to J L and mailed it the same date. The check was debited to Sider's account on December 18, 1981.

Predictably enough, the ninetieth day preceding the filing of the Chapter 7 petition occurred on December 15, 1981. This was the day after the check was mailed, and presumably the earliest day the check could have been received by J L and three days before the check cleared.

Between December 18, 1981 and February 19, 1982, the Bank made advances in excess of $200,000 to Sider in reliance on the Lewo and J L guarantees. On February 19, 1982 the total owed to the Bank was $3,756,407.64.

Sider filed its voluntary petition under Chapter 7 of the Bankruptcy Code on March 15, 1982. The steel inventory referred to above is the only property of the estate which was subject to the Bank's security interest on the filing date.

## CONCLUSIONS OF LAW

Sider delivered its $100,000 check to J L when the check was mailed on December 14, 1981. The transfer of the $100,000 to J L effected by Sider's December 14, 1981 check is deemed to have occurred on December 14, 1981 because J L perfected the transfer within 10 days thereafter when the check cleared Sider's bank account, Bankruptcy Code § 547(e)(2)(A), 11 U.S.C. § 547(e)(2)(A). Since December 14, 1981 is outside the 90-day preference period, the transfer cannot be avoided by the Trustee as a preference under Bankruptcy Code § 547, 11 U.S.C. § 547.

## DISCUSSION

The Trustee's complaint to recover the payment to J L is predicated on the assumption that the transfer occurred on the date the $100,000 check cleared Sider's bank account, a date admittedly within 90 days of the date of the filing of the petition. In her memorandum of law, the Trustee has

cited several cases supporting this position. J L, on the other hand, urges that the transfer occurred when Sider mailed the check, a date outside the 90-day preference period, and cites legislative history as well as several cases in support of its position.

After careful analysis of Bankruptcy Code § 547, its legislative history, the case law and the New York Uniform Commercial Code, this court is persuaded that the date of mailing of the check is the controlling date in this case for the reasons which follow. An essential element of any preference action is that a transfer of property of the debtor be made on or within 90 days before the date of the filing of the petition. Bankruptcy Code § 547(b)(4)(A). Transfer is a defined term and means

"every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest." Bankruptcy Code § 101(40).

See S.R. No. 95–989, 95th Cong. 2d Sess. 27 U.S.Code Cong. & Admin.News, 1978, p. 5787 (1978) ("The definition of transfer is as broad as possible"); and 2 Collier on Bankruptcy (15th ed.) ¶ 101.41.

Bankruptcy Code § 547(e)(2)(A) states that a transfer is made "at the time such transfer *takes effect* between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time." (Emphasis added). "Though the issue of when a transfer is complete is a federal question, it must be decided by reference to state law." *Olsen-Frankman Livestock Marketing Service, Inc. v. Citizens National Bank,* 4 B.R. 809, 812–813 (D.Minn.1980), citing *McKenzie v. Irving Trust Co.,* 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945). With respect to checks, state law may be found in New York's version of the Uniform Commercial Law, N.Y. UCC 1–101 *et seq.* (McKinney's 1981).

A check is an instrument. N.Y. UCC § 3–102. In order for an instrument to be effective it must be delivered. *First Security Bank of Bozeman v. Goddard,* 181 Mont. 407, 593 P.2d 1040, 1044 (1979). "Delivery"

means as to instruments "voluntary transfer of possession." N.Y. UCC § 1–201(14). The general rule is that delivery by mail is complete at the time of mailing when the check is mailed at the instance of the payee. *Brady on Bank Checks* § 5.7 at 5–15 (5th ed. 1979). *See also McKenzie v. Irving Trust Co., supra; First Security Bank of Bozeman v. Goddard, supra.* As there is nothing to suggest that this case is not governed by the general rule, the $100,000 check must be held to have been delivered to J L when mailed. Thus, under state law the check became effective between Sider and J L on December 14, 1981.

The delivery of a check initiates the normal and customary process by which the drawer effects the transfer of its property comprised of bank deposits. *See Matter of Advance Glove Manufacturing Co.,* 25 B.R. 521, 524 (Bkrtcy.E.D.Mich.1982) ("The delivery of the check constituted a transfer of property.") It is well to remember that a check is a direction to a third party, the bank, to make payment to the payee and to deduct the amount of the payment from the drawer's funds on deposit with the bank. Furthermore, it should be remembered that the relationship between the drawer and the bank is a debtor-creditor relationship, as becomes evident upon the insolvency of the bank. The check enables the payee to effect the transfer of monies out of the account; without the check, the payee would be unable to effect the transfer.

The importance of the check as a means of effecting a transfer of payment is emphasized by consideration of the impact of the delivery of the check on the underlying obligation. N.Y. UCC § 3–802(1)(b) provides for the suspension of the obligation *pro tanto* until the check is presented. Discharge on the check discharges the obligation. If the check is dishonored, an action may be maintained either on the instrument or on the obligation. The matter is well stated in the Official Comment to this section:

"It is commonly said that a check or other negotiable instrument is 'conditional payment.' By this it is normally meant that

taking the instrument is a surrender of the right to sue on the obligation until the instrument is due, but if the instrument is not paid on due presentment the right to sue on the obligation is 'revived.'"

See also Brady on Bank Checks § 4.4 at 4–9 (5th ed. 1979). Compare, Duke v. Sun Oil Company, 320 F.2d 853, 861–62 (5th Cir. 1963).

■ Bankruptcy Code § 547(e)(1)(A) provides that a transfer is perfected "when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." Once a check is paid, the transfer is perfected under this test. Bankruptcy Code § 547(e)(2)(A) provides that if perfection occurs within 10 days after a transfer takes effect between the parties, a transfer is made on the date it takes effect, not the date it is perfected. As between Sider, the transferor, and J L, the transferee, the transfer took effect on the date the check was delivered, December 14, 1981. Since J L thereafter perfected the transfer of the $100,000 to it within 10 days by successful presentment of the check, the transfer relates back to December 14, 1981.

The term "perfected" as used in Bankruptcy Code § 547(e)(2)(A) is not among the many terms defined in the Bankruptcy Code, nor is the term defined in the Uniform Commercial Code. Black's Law Dictionary (4th ed. 1968) defines "perfect" as meaning "complete; finished; executed; enforceable; without defect; merchantable; marketable." Although the term perfected is frequently used in connection with security interests, there is nothing inherent in the term or its use in Bankruptcy Code § 547(e)(2)(A) which precludes its application to the check delivery and collection process. "This ten-day grace period applies to a broader class of transactions than the old twenty-one-day period [under the former Bankruptcy Act]." 4 Collier on Bankruptcy ¶ 547.45 at 547–135 (15th ed. 1979). Nor does it apply only to transactions intended to be contemporaneous transfers. See In re Church Buildings and Interiors,

Inc., 14 B.R. 128 (Bkrtcy.W.D.Okl.1981). The court is of the opinion that the construction that it has given to Bankruptcy Code § 547(e)(2)(A) represents a rational incorporation of state law commercial concepts, as well as according with the commercial reality that checks are a major medium of exchange, with the payment of obligations routinely made by check.

In holding as it has this court declines to follow Matter of Duffy, 3 B.R. 263 (Bkrtcy. S.D.N.Y.1980), involving a postdated check, and In re Sportsco, Inc., 12 B.R. 34 (Bkrtcy. D.Ariz.1981). This court does not, however, view its holding as inconsistent with Klein v. Tabatchnick, 610 F.2d 1043 (2d Cir.1979), since that case dealt with a situation in which the check was never paid. In that case the Second Circuit found that return to the drawer of an undeposited check payable to the bankrupt did not effect either a fraudulent conveyance or a preference since its return transferred nothing from the estate. The Klein case simply illustrates the conditional nature of a payment made by check. See also Olsen-Frankman Livestock, supra, at 813. That perfection of payment by check can be defeated in a number of ways, such as by the insolvency of the bank, a stop payment order, an insufficiency of funds in the drawer's account, or failure of consideration in the underlying transaction, is apparent. Yet to say that perfection can fail merely begs the question in a case in which perfection occurs.

Cases decided under the former Bankruptcy Act likewise are inapposite because they turn on construction of a statute not applicable in this case. The statutory history of the comparable provisions in Section 60 of the former Bankruptcy Act was complex. See 4 Remington on Bankruptcy, § 1696 (1957). Such decisions as Nicholson v. First Investment Co., 705 F.2d 410 (11th Cir.1983); Shamrock Golf Co. v. Richcraft, Inc., 680 F.2d 645 (9th Cir.1982) and Fitzpatrick v. Philco Finance Corp., 491 F.2d 1288 (7th Cir.1974) do not have precedential value in construing the plainly different provisions of the Bankruptcy Code.

Although this court has reached its decision on the basis of consideration of the Bankruptcy Code and the Uniform Commercial Code, a review of the legislative history of Bankruptcy Code § 547 supports the conclusion reached. The House and Senate Reports on their respective bills contain identical language:

"This section is a substantial modification of present law. It modernizes the preference provisions and brings them more into conformity with commercial practice and the Uniform Commercial Code." H.R. 95–595, 95th Cong. 1st Sess. 372 (1977); S.R. No. 95–989, 95th Cong. 2d Sess. 87, U.S.Code Cong. & Admin.News 1978, at p. 5873 (1978).

"Normally a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be 'intended to be contemporaneous,' and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3–503(2)(a), that will amount to a transfer that is 'in fact substantially contemporaneous.'" H.R. 95–595, 95th Cong. 1st Sess. 373 (1977); S.R. No. 95–989, 95th Cong. 2d Sess. 88, U.S.Code Cong. & Admin.News 1978, at p. 5874 (1978).

Subsequently, after a conference between the House and Senate Committees on a modified bill, the Congressional Record reported the following:

"Contrary ·to language contained in the House Report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of §§ 547(c)(1) and (2)." 124 Cong.Rec. H 11097 (daily ed. Sept. 28, 1978) and S 17414 (daily ed. Oct. 6, 1978) cited in Appendix 3 Collier on· Bankruptcy (15th ed. 1979).

The significance of these passages of the legislative history of Bankruptcy Code § 547 lies in their recognition that interpretation of even Bankruptcy Code § 547, which is admittedly somewhat arbitrary, must incorporate modern commercial practice and the Uniform Commercial Code.[1] In short, preference suits involving payments by check must necessarily involve consideration of the provisions of the Uniform Commercial Code.

■ As the court has found that the Trustee has failed to establish the existence of a transfer within 90 days, the Trustee's action therefore fails as she has not satisfied a prime element for recovery under Bankruptcy Code § 547.[2]

---

1. Although this court's interpretation of the Bankruptcy Code § 547 is in harmony with the legislative history, some courts have found the legislative history of the section difficult to reconcile with its express terms. *See, e.g., In re Super Market Distributors Corp.,* 25 B.R. 63 (Bkrtcy.D.Mass.1982); *In re Gold Coast Seed Co.,* 30 B.R. 551 (Bkrtcy.App. 9th Cir.1983) (Word transfer in § 547(c)(4) has different meaning than same term used elsewhere in § 547.). It is suggested that the legislative history may be reconciled with the express language of Bankruptcy Code § 547 by giving due weight to the savings clause provided in § 547(e) for transfers by check and by according to the phrase "contemporaneous exchange" used in § 547(c)(1) the meaning suggested in the legislative history based on the provisions of the Uniform Commercial Code.

2. However, even if the transfer had been within 90 days, this court would have denied recovery to the Trustee on the grounds that Bankruptcy Code § 547(c)(4) precludes avoidance of the transfer because J L gave new value after re-

ceipt of the transfer. Bankruptcy Code § 547(a)(2) defines new value as follows:

" 'new value' means money or money's worth in goods, services, or new credit, * * * * but does not include an obligation substituted for an existing obligation."

As the Bank was only a partially secured creditor, it cannot be subject to question that a payment to it during the 90-day period would have been preferential both as to it and as to Lewo and J L, as guarantors. That the guarantors in such a situation are the recipients of a preference is beyond dispute in view of the long line of decisions so holding under both the former Bankruptcy Act and the Bankruptcy Code. *See, e.g., Smith v. Tostevin,* 247 F. 102 (2d Cir.1917); 4 Collier on Bankruptcy ¶ 547.18 (15th ed. 1979).

The present situation presents the converse: the guarantor argues that the Bank's new loans to the debtor result in the guarantor giving new value to the debtor, at least when the Bank is undersecured, because of the increase in the guarantor's actual exposure. Here it was stip-

Settle judgment in accordance with this decision.

ulated that the Bank would not have made the additional $200,000 in loans to Sider but for the Lewo and J L guarantees. J L gave new value in that it caused the Bank to provide new money to Sider; it provided money's worth in the form of a service to wit, acting as guarantor; and finally it gave money's worth in the form of new credit to Sider by virtue of the increase in the guarantee obligation.

The Trustee has urged that J L did not give "new" value since it had been obligated on its guaranty since summer 1981. This argument, advanced on the basis of *In re Rustia,* 20 B.R. 131 (Bkrtcy.S.D.N.Y.1982), which held that increased availability of an unused line of credit was not new value, ignores the nature of a continuing guaranty. At any time J L could have terminated the guarantee by its express terms by giving notice to the Bank, and J L's liability would have been limited to amounts advanced prior to the notice. *See, Delaware Funds, Inc. v. Zuckerman-Honickman, Inc.,* 43 A.D.2d 889, 351 N.Y.S.2d 769 (1974); *Levy v. Margolies,* 152 Misc. 367, 273 N.Y.S. 237 (1934). J L's obligation did not actually arise until the additional loans were made to Sider within the 90-day preference period.

"In its inception, a continuing guaranty is an offer from the guarantor and is accepted by the creditor each time the creditor performs a specified act (such as extending credit to the debtor). * * * At any period of time, therefore, the legal relation between the guarantor and the creditor involves both a contract (as to transactions between the creditor and principal debtor which have been completed) and an offer (as to future transactions between the creditor and principal debtor)." 38 Am.Jur.2d *Guaranty* § 63 at 1064 (1968). *Compare In re Diversified World Investments, Ltd.,* 12 B.R. 517 (Bkrtcy.S.D.Tex.1981) (Although assignment of rents took place outside of 90-day preference period, transfer was not considered complete until rents accrued within 90-day period.)

It cannot be disputed that the estate was enhanced to the extent of the $200,000 by virtue of the additional loans. Elemental fairness requires that guarantors be treated consistently so that if they are charged with the burden of the principal debtor's payments to the creditor they can assert those same transactions to their benefit for the purpose of establishing new value in an appropriate case.